**YERARDI'S MOODY STREET RESTAURANT & LOUNGE, INC., Plaintiff, Appellee,**

v.

**BOARD OF SELECTMEN OF the TOWN OF RANDOLPH, Defendant, Appellee.**

Appeal of Joseph J. SEMENSI, Paul J. Connors and Maureen A. Dunn, Defendants.

No. 88–2242.

United States Court of Appeals, First Circuit.

Heard May 3, 1989.

Decided June 22, 1989.

John Foskett with whom Paul R. DeRensis and Deutsch Williams Brooks DeRensis Holland & Drachman, P.C., Boston, Mass., were on brief, for appellants.

Susan A. Jackson with whom Michael W. Reilly and Pichette, Reilly & Jackson, Boston, Mass., were on brief, for plaintiff, appellee.

Before BOWNES and BREYER, Circuit Judges, and GRAY,* Senior District Judge.

BOWNES, Circuit Judge.

This civil rights case is before us on interlocutory appeal from the district court's denial of the individual defendants' motion for summary judgment on the issue of qualified immunity. The case arises out of actions by defendants—the Board of Selectmen of the Town of Randolph and three board members, Joseph Semensi, Paul Connors and Maureen Dunn [1]—with respect to liquor licensing decisions involving plaintiff, Yerardi's Moody Street Restaurant & Lounge, Inc. (Yerardi's). For the reasons set forth below, we find the individual defendants are entitled to qualified immunity and reverse the district court's ruling.

FACTS

Before reciting the facts that bear on this particular case, we describe the framework within which local liquor licensing boards must work. Under Massachusetts

---

* Of the Central District of California, sitting by designation.

1. The other two members of the five person Board, Messrs. Sullivan and Yorra, were not named as defendants. At some time during the years at issue here, Messrs. Sullivan and Yorra were replaced by Mr. Previti and Mrs. Bowers, neither of whom was named as a defendant.

law, the Board of Selectmen of the town is the "Local licensing authorit[y]" for alcoholic liquors when no special licensing board has been created. Mass.Gen.L. ch. 138, § 1. The local licensing authority has the power, within certain limits, to set the hours for the sale of alcoholic beverages by taverns and restaurants. Mass.Gen.L. ch. 138, § 12, para. 6. Under that provision, the hours for the sale of alcoholic beverages may be set "either generally or specifically for each licensee." *Id.* But, sales must be allowed between the hours of 11 a.m. and 11 p.m. and cannot be allowed, in restaurants, from 2 a.m. to 8 a.m. *Id.* As to a local licensing authority's decision with respect to the remaining hours, the Massachusetts Supreme Judicial Court has stated that

> the hours of a licensee during the periods from 8 A.M. to 11 A.M. and from 11 P.M. to the statutorily mandated closing time (2 A.M. as to restaurants) are a matter solely of local control, subject only to judicial review of a local authority's failure to give a proper hearing. The local authorities may decrease hours when there is a "public need for such decrease." G.L. c. 138, § 12. We discern a legislative intention to permit unreviewable policy considerations to govern the availability of "extra" hours of licensees.

*Casa Loma, Inc. v. Alcoholic Beverages Control Comm'n,* 377 Mass. 231, 385 N.E. 2d 976, 978 (1979); *see also Yerardi's Moody St. Restaurant & Lounge, Inc. v. Board of Selectmen of Randolph,* 19 Mass.App. 296, 473 N.E.2d 1154, 1156–57 *(Yerardi's I), further review denied,* 394 Mass. 1103, 477 N.E.2d 595 (1985).

Before considering the facts, we stake out the scope of our factual review. We recently stated that

> we have jurisdiction to review a district court's denial of qualified immunity on grounds that a genuine issue of material fact exists as to the factual predicate of a qualified immunity claim. In such a review, we must examine the discovered facts regarding defendants' conduct rele-

vant to the immunity claim and, applying normal summary judgment principles, determine whether a genuine issue does or does not exist concerning qualified immunity.

*Unwin v. Campbell,* 863 F.2d 124, 132 (1st Cir.1988); *see also Rodriguez v. Comas,* 875 F.2d 979, 981 (1st Cir.1989) (we "review[ ] the entire record developed on summary judgment.") (footnote omitted). Under normal summary judgment principles,

> [c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *see also Shinberg v. Bruk,* 875 F.2d 973, 974 (1st Cir.1989) ("we are mindful of our duty to review the record in the light most favorable to the party opposing the motion for summary judgment."); *Raskiewicz v. Town of New Boston,* 754 F.2d 38, 44 (1st Cir.), *cert. denied,* 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 111 (1985).

The Board of Selectmen of the Town of Randolph (Board) is the local licensing authority for Randolph. In 1980, Yerardi's purchased an establishment known as Capuchino's, which held a 2 a.m. liquor license. At about the same time, defendants Dunn and Connors were involved in altercations in the restaurant's parking lot.[2] In August of 1980, Yerardi's requested a transfer of the 2 a.m. liquor license from Capuchino's to itself. The Board held a hearing but decided to defer a decision pending further investigation. Two weeks later, the hearing was continued. At the end of that hearing, Connors moved that the license be transferred, but with a 1 a.m. closing time. Sullivan seconded the mo-

---

**2.** Connors was also refused additional liquor at a Christmas party; the year of this incident is not indicated in the record.

tion, which passed by a vote of 2–1.[3] Defendant Dunn cast the dissenting vote; earlier in the hearing she had moved that the Board delay a decision until further investigation was completed.

A year later, in August of 1981, Yerardi's requested an extension of its closing time to 2 a.m. Yerardi's presented evidence that: (1) other establishments in the vicinity had 2 a.m. licenses; (2) it was suffering financial hardship by having to close earlier; and (3) there had been relatively few incidents requiring police intervention since the transfer of the license. The request was denied by a vote of 3–2, with the defendants casting the three votes against extension. Yerardi's requested a statement of reasons for the denial; the Board declined to give one after its attorney stated that it was not required to do so under Mass.Gen.L. ch. 138, § 23.

On April 12, 1982, Yerardi's again requested an extension of its closing time. At this hearing, Yerardi's presented evidence that: (1) it ran the business in a responsible manner; (2) the other establishments in the vicinity had 2 a.m. licenses; and (3) the Chief of Police, Safety Officer and Building Inspector were not opposed to the extension. The extension was denied by a vote of 3–2, with the defendants casting the three votes against extension. The Board did not state the reasons for its action.

A month later, Yerardi's filed suit in Massachusetts Superior Court seeking review of the Board's decision denying extension. An affidavit by defendants stated some but not all of the reasons for their action.[4] The superior court granted the Board's motion for summary judgment on the basis that its decision was not arbitrary or capricious. The Massachusetts Appeals Court reversed. The court decided that

the board ought to reconsider Yerardi's application. By no means are we saying that the board should find for Yerardi. It may well be, for example, that a com-

bination of "unreviewable policy considerations" with reasons that the board members did not disclose will amply justify their negative decision. The question is open on remand.

*Yerardi's I*, 473 N.E.2d at 1158.

After remand but prior to the Board's decision, Yerardi's filed the present action in federal district court pursuant to 42 U.S. C. §§ 1983, 1985. Yerardi's complaint contained four counts. Count I alleged a violation of plaintiff's right to due process. Count II alleged a violation of plaintiff's right to equal protection. Count III alleged a conspiracy to deprive plaintiff of its rights under state and federal law. Count IV alleged a conspiracy to single out plaintiff for unequal and discriminatory treatment.

On remand from the state appellate court, the Board held a hearing on May 6, 1985 but decided to postpone its decision for a month. On June 3, 1985, the Board voted 3–2 to extend Yerardi's license to 2 a.m.; the dissenting votes were cast by Connors and Dunn. At some time in 1985 prior to this vote, defendant Semensi was involved in an incident in which he was forced to relinquish a bottle of liquor he attempted to bring into Yerardi's.

In April 1986, the Board held a hearing to consider the transfer of all licenses held by Yerardi's, not just its liquor license, to Lombardo's, another establishment in the same vicinity. It was proposed that the licenses be transferred without cutting back the closing time to 1 a.m. Lombardo's stated that the premises would remain closed until it found a lessee, at which point a transfer of the licenses to the lessee would be sought. The Board expressed concern about the effect of the pending federal litigation on the transfer to Lombardo's. Mr. Yerardi, who is an attorney, stated that the suit "has nothing to do with this license," but rather, the "litigation has to do with past practice by the Board." Two weeks later, the Board unanimously

---

3. Defendant Semensi and Board member Yorra were not present at this hearing.

4. As the state appellate court noted, "the statement that the reasons set out were 'not all of our reasons' teases a court without enlightening it." *Yerardi's I*, 473 N.E.2d at 1158.

approved the transfer without a 1 a.m. closing time.

The district court dismissed all of plaintiff's claims except for its § 1983 claim of a violation of its right to equal protection. Discovery proceeded and produced evidence concerning other Board actions with respect to liquor licenses. Before discussing this evidence, we must first decide the issue of what time frame is appropriate for the comparison of other Board actions to the actions taken in plaintiff's case. The district court did not address this issue. Both sides agree that the relevant period begins in 1980 when the transfer to Yerardi's was approved. The period ends, we believe, when Yerardi's received the relief it sought—a 2 a.m. license in 1985—because thereafter it was no longer being treated differently than its competitors. Plaintiff nonetheless argues that the relevant time frame should include the 1986 transfer of its license to Lombardo's without a 1 a.m. closing. We reject this argument for several reasons. First, plaintiff filed suit prior to this event, and the complaint was not amended after the Board's subsequent actions. Second, Mr. Yerardi, an attorney, stated at the transfer hearing that the litigation dealt with *past* actions by the Board. Third, the transfer occurred in the context of pending federal litigation over the 1 a.m. transfer to Yerardi's. Fourth, the transfer to Lombardo's was of all licenses held by Yerardi's not just its liquor license. Fifth, there is no evidence that the Board considered the appropriate closing time with respect to this transfer. Indeed, the evidence was to the effect that such consideration was unnecessary at the time—Lombardo's was not going to operate the establishment, rather it was to remain closed until a leasee was found and the licenses retransferred. We now turn to the Board's actions from 1980 to 1985:

Dunn had twice, in 1982 and 1985, proposed that all 2 a.m. liqour licenses be curtailed to 1 a.m. licenses. These proposals were defeated by votes of 4–1.

On April 13, 1981, the Board voted 4–0 [5] to transfer a liquor license from Gramp's,

Inc. to John Emmuel. The license held by Gramp's had at 1 a.m. closing time but stated that this was "voluntary." The transfer was of a 1 a.m. license, with no mention of it being voluntary.

On January 3, 1983, the Board considered the transfer of a license from Chateau de Ville, Inc. to Lombardo's, Inc. Defendant Dunn was not present at this meeting. After a motion was made to approve the transfer, defendant Connors moved to amend the license to a 1 a.m. closing time. The amendment was not made a part of the motion because Sullivan, who made the original motion, would not accept it. The license was then transferred by a unanimous 4–0 vote. At this point, Connors moved that the license be shortened to a 1 a.m. closing time. Defendant Semensi requested that the absent member, defendant Dunn, be polled as to this issue. The joint motion for a 1 a.m. closing time and the polling of Dunn was defeated by a 2–2 vote, with Connors and Semensi voting in favor.

The district court denied the defendant's motion for summary judgment without an opinion. This interlocutory appeal followed.

## DISCUSSION

In deciding the issue of qualified immunity, the Supreme Court has held "that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). More recently, the Court has expanded on this standard:

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held un-

---

**5.** The record is not clear as to identity of those voting.

lawful, *see Mitchell* [*v. Forsyth* ], 472 U.S. [511] at 535, n. 12, 105 S.Ct. [2806] at 2820, n. 12 [86 L.Ed.2d 411 (1985) ]; but it is to say that in the light of preexisting law that unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *see also Borucki v. Ryan,* 827 F.2d 836, 837–38 (1st Cir.1987). We recently described this analysis as a two-part process:

> We first examine the law, to determine whether the right allegedly violated was "clearly established"; if so, the defendant should reasonably have known of the right. Second, we examine the defendant's conduct, to establish whether objectively it was reasonable for him to believe that his actions did not violate a "clearly established" right.

*Rodriguez v. Comas,* 875 F.2d at 981.

The equal protection right allegedly violated is the right not to be treated differently from others similarly situated for improper reasons. *See, e.g., Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The Second Circuit's statement in an analogous case, which involved economic regulation concerned with public health, is equally apt here: "This case is lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply." *LeClair v. Saunders,* 627 F.2d 606, 608 (2d Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). We will assume, without deciding the issue, that the equal protection right allegedly violated was clearly established because the second prong of the analysis establishes that the individual defendants are entitled to qualified immunity.

This part of the test focuses on two points: (1) each defendant's actions, not the actions of the Board collectively, *see Anderson,* 107 S.Ct. at 3038 (defendants are entitled to qualified immunity "so long as *their actions* could reasonably have been thought consistent with the rights they are alleged to have violated.") (emphasis added); *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984) (officials need to be able to "anticipate when *their conduct* may give rise to liability for damages.") (emphasis added); *see also Unwin,* 863 F.2d at 133–37 (separating the discussion of qualified immunity between different groups of defendants whose actions were similar); and (2) the objective determination of whether "a reasonable official" would realize that his/her actions violated the plaintiff's rights. *See Anderson,* 107 S.Ct. at 3039; *Rodriguez v. Comas,* 875 F.2d at 981.

Here, defendants Connors and Semensi each consistently voted, during the applicable time frame, to make the closing time for *all transfer* licenses 1 a.m. Defendant Dunn took an even more severe, but equally uniform position, that *all* licenses should have a 1 a.m. closing time. Dunn twice specifically proposed rolling back all licenses but was out-voted in each instance. All defendants staked out uniform positions which they then applied uniformly in their votes. Yerardi's argues that the Board's decision in 1983 to transfer the license from Chateau de Ville to Lombardo's without a 1 a.m. closing shows that similarly situated applicants were treated differently. It is true that the Board treated an applicant differently in that instance but this is irrelevant. The focus is on the individual defendants and in this instance, the defendants voted consistently with their prior positions. Connors and Semensi voted for the transfer of the license, but they attempted to make it a 1 a.m. license. Indeed, they even attempted to poll defendant Dunn, who was not present, on the issue of the closing time. The fact that the individual defendants were unsuccessful in one case in no way undercuts the fact that *they,* as opposed to the *Board,* consistently voted in certain ways.[6]

In deciding how a reasonable selectman would view such actions, we note that the closing time for serving alcoholic beverages from 11 p.m. to 2 a.m. is "a matter

---

**6.** Defendants did not discriminate on the basis of such obviously improper bases as religion or race.

solely of local control." *Casa Loma,* 385 N.E.2d at 978. And, the right to equal protection is the right not to be treated differently from those similarly situated. *See, e.g., Yick Wo,* 118 U.S. at 374, 6 S.Ct. at 1073 (comparing those who "carry on the same business under similar conditions"). A consistently held position consistently applied to all license applicants can not show selective treatment.

Both sides rely on *LeClair,* 627 F.2d 606, as providing the test for liability in this case. We agree that it is a well reasoned case. In *LeClair,* the court held

that liability in the instant type of equal protection case should depend on proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Id.* at 609–10. A firm adherence to a position consistently applied to all license applicants is not proof of selective treatment. The only possible claim here of impermissible considerations would be that of malicious or bad faith intent to injure. Even assuming that plaintiff's assertion of malicious or bad faith intent to injure it can be proven, such proof does not refute the fact that all applicants, including Yerardi's, received consistent treatment by each defendant. Because selective treatment is the gravemen of an equal protection claim, no reasonable official would believe that voting consistently for a 1 a.m. closing time would be considered selective treatment of one applicant.

Since defendants' actions were not such that their unlawfulness would have been apparent to a reasonable selectman, they are entitled to qualified immunity. The order denying defendants qualified immunity is, therefore,

*Reversed.* Judgment shall issue for defendants.

Costs awarded to appellants.